No. 24-50096

# In the United States Court of Appeals
# For the Fifth Circuit

**ODIS JONES,**

*Plaintiff - Appellee,*

v.

**CITY OF HUTTO,**

*Defendant - Appellant.*

On Appeal from United States District Court
for the Western District of Texas
C.A. No. 1:20-CV-1210

## BRIEF OF APPELLANT CITY OF HUTTO

RAMON G. VIADA III
VIADA & STRAYER
rayviada@viadastrayer.com

GEORGE E. HYDE
HYDE KELLEY LLP
ghyde@txlocalgovlaw.com

**ATTORNEYS FOR APPELLANT
CITY OF HUTTO**

# CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## PARTIES

| | |
|---|---|
| **Odis Jones** | Plaintiff - Appellee |
| **City of Hutto, Texas** | Defendant - Appellant |

## TRIAL AND APPELLATE COUNSEL

| | |
|---|---|
| **Ramon G. Viada III**<br>VIADA & STRAYER<br>The Woodlands, Texas | Appellate Counsel<br>for Appellant |
| **George Edward Hyde**<br>**Matthew L. Weston**<br>HYDE KELLEY, L.L.P.<br>Austin, Texas | Trial and Appellate Counsel<br>for Appellant |

**Marcy Hogan Greer**
**Kirsten M. Castañeda**
ALEXANDER DUBOSE & JEFFERSON LLP
Dallas, Texas

Trial and Appellate Counsel
for Appellee

**Douglas W. Alexander**
ALEXANDER DUBOSE & JEFFERSON LLP
Dallas, Texas

Trial Counsel
for Plaintiff-Appellee

**Edward M. "Ted" Smith**
**Andrew Broadaway**
CORNELL SMITH MIERL BRUTOCAO
BURTON, LLP
Austin, Texas

**Jay D. Ellwanger**
**Holt M. Lackey**
ELLWANGER LAW LLLP
Austin, Texas

_/s/ **Ramón G. Viada III**_
Ramón G. Viada III

ATTORNEY FOR APPELLANT
CITY OF HUTTO

## STATEMENT REGARDING ORAL ARGUMENT

This is an appeal from a $7.5 million judgment against a municipality, following a jury verdict for the plaintiff. The case raises several important issues of law, including but not limited to, whether Title VII's cat's paw theory of employer liability, which is based on agency principles, applies to a Section 1983 claim based on the decision of a multi-member City Council. In addition, the record in this appeal is voluminous – over 5,000 pages of printed material, including over 100 trial exhibits. The City requests oral argument to enable counsel to identify and clarify issues for the Court that the briefing leaves unexplained and to answer questions the Court may have about the contents of the large appellate record.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PARTIES . . . . . . . . . . . . . . . . . . . ii

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

I.    JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

           1.   City & Departmental Organization . . . . . . . . . . . . . . . . . 2

           2.   Events Leading to November 21, 2019 Separation
                Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

           3.   November 25, 2019 "Press Release" by Snyder
                and Tanner Rose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           4.   New City Attorneys Review Prior Contracts. . . . . . . . . . 10

           5.   Budget Crisis and the Eide Bailly Audit . . . . . . . . . . . . 12

           6.   December 2020 Council Resolution Rescinding the
                Separation Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 14

           7.   Removal of Commemorative Plaque . . . . . . . . . . . . . . . . 15

           8.   Jones's Post-Hutto Employment . . . . . . . . . . . . . . . . . . . 16

B.  Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

V.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.  Essential Elements of Municipal Liability for Section 1981 Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.  The City Is Entitled to Judgment as a Matter of Law on Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

  1.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

  2.  No Valid Contractual Interest Proven . . . . . . . . . . . . . . . 26

  3.  No Impairment of Contractual Relationship by the City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    (a)  *The City's rescission of the Separation Agreement did not impair Jones's rights because Jones received his Severance Pay* . . . . . . . . . . . . . . . . . . . . 32

    (b)  *The City did not "disparage" Jones* . . . . . . . . . . . . 33

    (c)  *Alleged stray remarks of Councilmen Snyder and Rose were unauthorized by and thus cannot be attributed to the City* . . . . . . . . . . . . . . . . . . . . . . . . 37

  4.  No Proof of Race Discrimination by the City Council . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    (a)  *No proof exists to show four Council votes were tainted by racism* . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    (b)  *Cat's Paw does not exist on the law or facts* . . . . . . . 45

       (c) *No similarly situated comparator was shown* . . . . . [48](#)

   5. No Proof to Support Any Actionable Breach of Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [50](#)

  C. No Evidence Supports the Damage Award . . . . . . . . . . . . . . [52](#)

   1. Section 1983 Damages Law . . . . . . . . . . . . . . . . . . . . . . . [52](#)

   2. No Evidence (or Factually Insufficient Evidence) Supporting Section 1983 Economic Damages . . . . . . . . . [53](#)

       (a) *Damages Lack Casual Link* . . . . . . . . . . . . . . . . . . . . [53](#)

       (b) *Amount of Economic Damages Lacks Evidentiary Support* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [58](#)

       (c) *Non-Pecuniary Damages Lack Evidentiary Support* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [61](#)

  D. Alternatively, the Excessive Damage Award Should Be Remitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [64](#)

  E. Alternatively, the Award Shocks the Conscience and Warrants a New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [68](#)

VI. Conclusion & Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [70](#)

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [71](#)

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . [72](#)

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Advanced Technology Building Solutions, L.L.C. v. City of Jackson*,
    817 F.3d 163 (5th Cir.) *cert. denied*, 580 U.S. 917 (2016) . . . . . . . [24](#)

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [25](#)

*Arguello v. Conoco*,
    330 F.3d 355 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [21](#)

*Auster Oil & Gas, Inc. v. Stream*,
    835 F.2d 597 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [68](#)

*BancPass, Inc. v. Highway Toll Admin., L.L.C.*,
    863 F.3d 391 (5th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [34](#)

*Beattie v. Madison County School District*,
    254 F.3d 595 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . [45](#)-[47](#)

*Besser v. Texas Gen. Land Off.*,
    834 F. App'x 876 (5th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . [55](#)

*Boyd v. State Farm Ins.*,
    158 F.3d 326 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [44](#)

*Brady v. Fort Bend County*,
    145 F.3d 691 (5th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . [62](#), [63](#), [68](#)

*Bryant v. Compass Group USA Inc.*,
    413 F.3d 471 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . [45](#), [48](#)

*Burch v. Coca-Cola Co.*,
    119 F.3d 305 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [68](#)

*Caldarera v. Eastern Airlines, Inc.*,
    705 F.2d 778 (5th Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

*Campbell v. Rainbow City*,
    434 F.3d 1306 (11th Cir.), *cert. denied*,
    549 U.S. 1020 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Carey v. Piphus*,
    435 U.S. 247 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 59, 62

*City of Bonham v. Southwest Sanitation*,
    871 S.W.2d 765 (Tex. App.—Texarkana 1994, writ denied). . . . . 38

*City of Corpus Christi v. Bayfront Assocs.*,
    814 S.W.2d 98 (Tex. App.—Corpus Christi 1991, writ denied) . . 23

*City of Denton v. Grim*,
    No. 22-1023, 2024 Tex. LEXIS 318 (Tex. May 3, 2024) . . 24, 37, 38

*City of LaPorte v. Barfield*,
    898 S.W.2d 288 (Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*City of San Antonio v. Fourth Court of Appeals*,
    820 S.W.2d 762 (Tex. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-47

*Clark County Sch. Dist. v. Breeden*,
    532 U.S. 268 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*,
    140 S. Ct. 1009 (U.S. 2020) . . . . . . . . . . . . . . . . . . . . . . . . 21, 42

*Connick v. Thompson*,
    563 U.S. 51 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Cox Enters., Inc. v. Bd. of Trs. of Austin Indep. Sch. Dist.*,
706 S.W.2d 956 (Tex. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Cox v. City of Dallas*,
430 F.3d 734 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Dallas Morning News, Inc. v. Tatum*,
554 S.W.3d 614 (Tex. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Davis v. Mobil Oil Exploration & Producing Southeast, Inc.*,
864 F.2d 1171 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

*Daystar Residential, Inc. v. Collmer*,
176 S.W.3d 24 (Tex. App.–Houston
[1st Dist.] 2004, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Delaney v. Univ. of Houston*,
835 S.W.2d 56 (Tex. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Exxon Mobil Corp. v. Rincones*,
520 S.W.3d 572 (Tex. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Fed. Sign v. Tex. S. Univ.*,
951 S.W.2d 401 (Tex. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Gasperini v. Ctr. for Humans, Inc.*,
518 U.S. 415 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Giles v. Gen. Elec. Co.*,
245 F.3d 474 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 61-64

*Gillum v. City of Kerrville*,
3 F.3d 117 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Harris v. FedEx Corp. Servs., Inc.*,
  92 F.4th 286 (5th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 67

*Hell Graphic Sys., Inc. v. Kingcraft Color Graphics, Inc.*,
  998 F.2d 1013 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Henderson v. Sotelo*,
  761 F.2d 1093 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Herron v. Maryland Casualty Co.*,
  347 F.2d 357 (5th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Hitt v. Connell*,
  301 F.3d 240 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 64

*Hollywood Fantasy Corp. v. Gabor*,
  151 F.3d 203 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Hopkins v. Stice*,
  916 F.2d 1029 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Huskey v. Jones*,
  45 F.4th 827 (5th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Jackson v. Host Intern., Inc.*,
  426 F. App'x 222 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 60

*James v. Brown*,
  637 S.W.2d 914 (Tex. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Jett v. Dall. Indep. Sch. Dist.*,
  491 U.S. 701 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Kallinen v. Newman*,
  No. 22-20383, 2023 U.S. App. LEXIS 7240,
  2023 WL 2645555 (5th Cir. Mar. 27, 2023) . . . . . . . . . . . . . . . . . 39

*Kelly v. Diocese of Corpus Christi*,
  832 S.W.2d 88 (Tex. App.—Corpus Christi 1992,
  writ dism'd w.o.j.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Landry v. Lincare, Inc.*,
  579 Fed. Appx. 734 (11th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . 50

*Landry's, Inc. v. Animal Legal Def. Fund*,
  631 S.W.3d 40 (Tex. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Lane v. Riverview Hosp.*,
  835 F.3d 691 (7th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*LaVerdure v. Cnty. of Montgomery*,
  324 F.3d 123 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lebron v. United States*,
  279 F.3d 321 (5th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Lee v. Kan. City S. Ry. Co.*,
  574 F.3d 253 (5th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Lindke v. Freed*,
  601 U.S. 187 (2024). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Longoria v. Hunter Express, Ltd.*,
  932 F.3d 360 (5th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Los Angeles County v. Humphries*,
  562 U.S. 29 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*McIver v. Gloria*,
  140 Tex. 566, 169 S.W.2d 710 (1943) . . . . . . . . . . . . . . . . . . . . . 59

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*,
  934 F.3d 447 (5th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Memphis Comm. Sch. Dist. v. Stachura*,
    477 U.S. 299 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [52](#)

*Milam v. City of San Antonio*,
    113 F. App'x 622 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . [44](#)

*Miniex v. Hous. Hous. Auth.*,
    400 F. Supp. 3d 620 (S.D. Tex. 2019). . . . . . . . . . . . . . . . . . . . . . [64](#)

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [21](#), [37](#)

*Murray v. Earle*,
    405 F.3d 278 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . [52](#), [56](#)

*Oden v. Oktibbeha Cnty., Miss.*,
    246 F.3d 458 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . [21](#)

*Odessa Tex. Sheriff's Posse, Inc. v. Ector County*,
    215 S.W.3d 458 (Tex. App.—Eastland 2006, no pet.) . . . . . . . . . . [29](#)

*Peterson v. City of Fort Worth*,
    588 F.3d 838 (5th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . [44](#)

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [25](#)

*Renfro Drug Co. v. Lawson*,
    138 Tex. 434, 160 S.W.2d 246 (Tex. 1943). . . . . . . . . . . . . . . . . [36](#)

*Rettberg v. Texas Dep't of Health*,
    873 S.W.2d 408 (Tex. App.—Austin 1994, no writ). . . . . . . . . . . [30](#)

*Salinas v. O'Neill*,
    286 F.3d 827 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . [67](#)

*Scarbrough v. Morgan County Bd. of Educ.*,
  470 F.3d 250 (6th Cir. 2006)............................... 23

*Sheffield Dev. Co. v. City of Glenn Heights*,
  140 S.W.3d 660 (Tex. 2004) .............................. 23

*Simeon v. T. Smith & Son, Inc.*,
  852 F.2d 1421 (5th Cir. 1988)............................. 66

*Smit v. SXSW Holdings, Inc.*
  903 F.3d 522 (5th Cir. 2018)............................. 51

*South Padre Island v. Jacobs*,
  736 S.W.2d 134 (Tex. App.—Corpus Christi 1987, writ denied) . 34

*Templeton v. Luckett*,
  75 F. 254 (5th Cir. 1898)................................. 41

*Tercero v. Texas Southmost Coll. Dist.*,
  989 F.3d 291 (5th Cir. 2021)............................. 54

*Tex. Natural Res. Conservation Comm'n v. IT-Davy*,
  74 S.W.3d 849 (Tex. 2002) .............................. 31

*Thomas v. Tex. Dep't of Criminal Justice*,
  297 F.3d 361 (5th Cir. 2002)............................. 66

*Tooke v. City of Mexia*,
  197 S.W.3d 325 (Tex. 2006) ............................. 32

*Univ. Computing Co. v. Mgmt. Sci. Am., Inc.*,
  810 F.2d 1395 (5th Cir. 1987)............................ 54

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013)...................................... 52

*Vadie v. Mississippi State University*,
    218 F.3d 365 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68

*Valle v. City of Houston*,
    613 F.3d 536 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Village of Bayou Vista v. Glaskox*,
    899 S.W.2d 826 (Tex. App.—Houston [14th Dist.]
    1995, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Warner v. Orange Cnty. Dep't of Prob.*,
    115 F.3d 1068 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Waters v. City of Chicago*,
    580 F.3d 575 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Wells v. Dallas Indep. Sch. Dist.*,
    793 F.2d 679 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 68, 69

*West v. City of Houston*,
    960 F.3d 736 (5th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*West v. Nabors Drilling USA, Inc.*,
    330 F.3d 379 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Worsham v. City of Pasadena*,
    881 F.2d 1336 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Yong Ki Hong v. KBS Am., Inc.*,
    951 F. Supp. 2d 402 (E.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . 35

*Young v. Bd. of Supervisors*,
    927 F.3d 898 (5th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Zachry Const. Corp. v. Port of Houston Auth. of Harris Cnty.*,
    449 S.W.3d 98 (Tex. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## Rules and Statutes

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 19, 21, 53

FED. R. CIV. P. 50(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

FED. R. CIV. P. 50(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

FED. R. CIV. P. 50(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

FED. R. CIV. P. 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

TEX. CIV. PRAC. & REM. CODE § 101.057(2) . . . . . . . . . . . . . . . . . . . . . 31

TEX. GOV'T CODE § 551.041 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

TEX. GOV'T CODE § 551.141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

TEX. GOV'T. CODE § 271.153(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

TEX. LOCAL GOV'T CODE § 271.157 . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CITY OF HUTTO CITY CHARTER, § 1.01 . . . . . . . . . . . . . . . . . . . . . . . 3, 26

CITY OF HUTTO CITY CHARTER, § 13.07 . . . . . . . . . . . . . . . . . . . . . . . 22

CITY OF HUTTO CITY CHARTER, § 13.08 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CITY OF HUTTO CITY CHARTER, § 3.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

CITY OF HUTTO CITY CHARTER, § 4.01(a) . . . . . . . . . . . . . . . . . . . . . . . 3, 47

CITY OF HUTTO CITY CHARTER, § 4.01(c) . . . . . . . . . . . . . . . . . . 3, 22, 47

CITY OF HUTTO CITY CHARTER, § 4.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

CITY OF HUTTO CITY CHARTER, § 8.10 . . . . . . . . . . . . . . . . . . . . . . . 26, 28

MISSOURI CITY CITY CHARTER, § 4.01(C) . . . . . . . . . . . . . . . . . . . . . . . . . 56

## **Other Authorities**

BLACK'S LAW DICTIONARY, (West 5th ed. 1979) . . . . . . . . . . . . . . . . . . . 28

RESTATEMENT (SECOND) OF TORTS (Am. Law Inst. 1965) . . . . . . . . 33, 56

# BRIEF OF APPELLANT CITY OF HUTTO, TEXAS

## I.    JURISDICTIONAL STATEMENT.

This suit, brought under 42 U.S.C. § 1981, raises a federal question for which subject-matter jurisdiction lies under 28 U.S.C. § 1331. Final judgment for plaintiff was entered on March 21, 2023.[1] On January 11, 2024, the District Court denied the City's post-judgment motions.[2] The City timely appealed on February 8, 2024.[3] Accordingly, appellate jurisdiction lies under 28 U.S.C. § 1291.

## II.   STATEMENT OF THE ISSUES.

1.    The judgment should be reversed and a take nothing judgment rendered for the City on Jones's Section 1981 claim, either because:

(a)    The Separation Agreement was void or voidable, and created no enforceable rights;

(b)    No legally sufficient evidence exists to support the jury finding that the City, acting through its final policymaker, denied Jones his right to "make or enforce" the Separation Agreement; or

(c)    No legally sufficient evidence exists to support the jury finding that the City, acting

---

[1] ROA.4651.

[2] ROA.4916-72.

[3] ROA.5114.

through its policymaker, breached the Separation Agreement because Jones is African-American.

2. The judgment should be reversed and a take nothing judgment rendered for the City on Jones's Texas breach of contract claim.

3. Alternatively, a judgment awarding only nominal damages should be rendered, because the evidence is legally insufficient to prove Jones sustained any damage caused by any breach of the Separation Agreement.

4. Alternatively, and only if the Court denies the City relief under Issues 1, 2, and 3, the Court should suggest a remittitur or grant a new trial on all issues, or alternatively, on damages, because the damage award is manifestly unjust, excessive, and the jury's verdict on liability and damages was the product of passion and prejudice.

## III. STATEMENT OF THE CASE.

### A. Factual Background.

#### 1. City & Departmental Organization.

Hutto is a Texas home-rule city operating under a city charter.[4]

Under the Charter, the elected City Council is empowered to "enact local

---

[4] *See* HUTTO CHARTER, ROA.7707.

legislation, adopt budgets, determine policies and appoint the City Manager."[5]

The City Council consists of a Mayor and six Council members.[6] The City Manager, the chief administrative officer, can be hired and fired "at the discretion" of the Council.[7] The City Attorney is also appointed by the Council."[8]

Jones was appointed City Manager in November 2016.[9] In July 2018, the Council entered an Employment Agreement with Jones. Voting in favor were: Mayor Doug Gaul and Councilors Tom Hines, Scott Rose, Nate Killough, Tim Jordan, Patti Turner (later Patti Martinez), and Terri Grimm.[10] Of these, only Hines and Jordan testified at trial.[11]

---

[5] ROA.7707, 7713, 7718.

[6] ROA.7707, ROA.7717.

[7] ROA.7707, 7721-22.

[8] ROA.7707, 7723.

[9] ROA.4610.

[10] ROA.6161-65, 6182.

[11] ROA.5064, 5755.

The Employment Agreement promised an annual salary of $275,000, in bi-weekly installments, plus a 3% yearly cost-of-living increase.[12] The City could terminate the employment at any time and without cause, subject to severance pay of twelve-months base salary plus continuation of group health plan benefits.[13]

The composition of the City Council changed in 2019. According to Byron Frankland, whom Jones hired as Chief of Police in 2017 and later as Assistant City Manager,[14] there was a political divide in Hutto between "pro-growth" and "anti-growth" advocates, with Jones associated in the public mind with pro-growth.[15] Frankland testified that the two new Council members, Mike Snyder and Tanner Rose (not to be confused with Scott Rose), were elected on a "get rid of Odis" platform.[16]

As discussed below, Jones's employment ended by a Separation Agreement approved in a 5-to-1 vote of the Council on November 21,

---

[12] ROA.6162.

[13] ROA.6162-63.

[14] ROA.5517.

[15] ROA.5523-24.

[16] ROA.5525-26.

2019.[17] Those who voted were Mayor Doug Gaul and Councilors Tom Hines, Scott Rose, Peter Gordon, Patti Martinez, and Tanner Rose. Then-Councilor Snyder was absent for the vote. Gordon testified at trial.[18]

The City Attorney changed during the relevant period. From 2017 until early 2020, William Bingham of McGinnis Lochridge served in that position.[19] Bingham testified at trial.[20] By March 2020, Dottie Palumbo of Bojorquez Law Firm assumed those duties.[21] No evidence exists to show Palumbo harbored racist views.

Council changed again in 2020. When the Council later voted (6-to-0) to rescind the Separation Agreement on December 3, 2020, its new members were Robin Sutton and Dan Thornton (who testified at trial).[22] Mike Snyder, Peter Gordon, Tanner Rose, and Patti Martinez also voted

---

[17] ROA.7760.

[18] ROA.6006.

[19] ROA.5766.

[20] ROA.5765.

[21] ROA.5933, 6027. Council directed staff to seek new legal services in early February. ROA.7024.

[22] ROA.6047, 7369-70.

for rescission. Doug Gaul, the Mayor, had resigned by that time, so his position was vacant; Mike Snyder was Mayor Pro Tempore.[23]

2. <u>Events Leading to November 21, 2019 Separation Agreement</u>.

Councilor Snyder was frustrated with a lack of transparency in the City under Jones.[24] Before and after he took office in the middle of May 2019, he had difficulty obtaining access to documents or agreements that Jones was negotiating as City Manager. For example, before he was elected, Snyder made a FOIA request for a lease Hutto had purportedly signed for the Perfect Game project.[25] After elected, Snyder asked Jones to send him the lease; Jones refused.[26] Snyder sought relief from the Texas Attorney General, but after the ruling, received a letter from Hutto that nothing was releaseable. Snyder testified: "by [September] we were in litigation and I still had not seen [the requested documents]."[27]

---

[23] ROA.7373.

[24] ROA.5898-5900, 5947-48.

[25] ROA.5902.

[26] ROA.5903.

[27] ROA.5904.

Councilor Gordon, also new on Council, testified that "it seemed like the city attorneys had at the time really kind of reported – appeared to report up through the city manager, at least in practice."[28] During meetings, citizens expressed concern about transparency, and questioned the amount of attorneys' fees as well as the legality of other matters.[29]

On November 16, 2019, a special meeting was called in which the attorneys notified the Council of a sexual harassment allegation against Jones.[30] In addition, Snyder sought to amend the Council's financial disclosure requirements to add the city manager.[31] Jones was unhappy with the amendment; soon announced he was going to exercise his right to find work elsewhere.[32]

On November 21, 2019, unknown to Snyder and while he was out of the country, a Separation Agreement[33] between the City and Jones was

---

[28] ROA.6012-13, 6020.

[29] ROA.5919, 7035-48, 6203, 6206, 7520, 7530-31, 8997 at 9132.

[30] ROA.5912-14.

[31] ROA.5918-5920.

[32] ROA.5920, 6013.

[33] ROA.5921-23, 6166-68.

entered on a 5-to-1 vote of the Council.[34] The agenda for the meeting left the subject matter for that item vague – a closed executive session to discuss "personnel matters, regarding city manager," with an open session to take up "[c]onsideration and possible action(s) on personnel matters regarding city manager."[35] The Separation Agreement contained four terms material to this suit: (1) payment to Jones of $412,000 severance (which occurred on January 3, 2020);[36] (2) a mutual release;[37] (3) a mutual confidentiality provision; and (4) a mutual non-disparagement provision, stating in relevant part: "Hutto agrees not to disparage, make any derogatory comments, whether written or oral, against Jones."[38]

The next month, the Council voted to hire Charles Daniels as the Interim City Manager.[39] Daniels is Black.[40] Councilmember Martinez

---

[34] ROA.7760-61.

[35] 11/21/2019 Amended Agenda (ROA.7779).

[36] ROA.4611, 6166, ¶ 2.

[37] ROA.6166, ¶ 5.

[38] ROA.6167, ¶ 6.

[39] ROA.7619.

[40] ROA.5552.

moved to enter a contract with Daniels, Councilmember Gordon seconded the motion, and Snyder voted in favor of the motion.[41]

### 3. November 25, 2019 "Press Release" by Snyder and Tanner Rose.

On November 22, 2019, the City issued a press release concerning Jones's departure that touted his accomplishments in glowing terms.[42] On November 25, however, Snyder and Tanner Rose posted their own opinions about the Agreement in an online post on Snyder's mayoral candidacy page, "From the Hutto City Council Office of Place 3 Mike Snyder and Hutto City Council Office Place 6 Tanner Rose."[43] Snyder referred to the post as a "press release"; but only his and Rose's names were typed at the end.[44] The post did not purport to be a statement of the City's, and no evidence exists showing that the City authorized or ratified it as a City publication.

---

[41] ROA.7619.

[42] ROA.7622.

[43] ROA.7543, 7559-69.

[44] ROA.7559-61.

4. <u>New City Attorneys Review Prior Contracts</u>.

By February 2020, the City had terminated McGinnis Lochridge as its city attorneys, and City operations changed dramatically.[45] Questions arose regarding the legal validity of several multi-million dollar contracts which Jones entered in 2019 related to a mixed-use development project called Perfect Game (also referred to as "Project Expansion)," which spawned prolific litigation.[46] For example, in July 2019, on advice of McGinnis Lochridge, the City had sued Wolverine, a developer, over contracts Jones had entered with respect to Perfect Game.[47] On advice of Mike Shaunessy of McGinnis Lochridge, the Council had voted in late 2019 to settle the Wolverine suit for $630,000. But after the new City Attorney took over, the City asserted that the underlying contracts were invalid for numerous reasons and that the ill-advised settlement was invalid.[48]

---

[45] ROA.5930, 5933-36.

[46] ROA.5904-05, 6032. Perfect Game is a baseball scouting company that initially planned to relocate its national headquarters to Hutto but then later opted to locate elsewhere. ROA.8582, 8732, 8852.

[47] ROA.5905-06, 5948, 6031.

[48] *See* ROA.7033, 7036, 8858- 8862.

Moreover, in June 2020, the City was sued by Legacy Hutto LLC, another developer with which Jones subsequently contracted for the Perfect Game project immediately after the Wolverine deal blew up.[49] Litigation also soon ensued over a loan and agreements entered – again under McGinnis Lochridge's advice – between the Cottonwood Development Corporation, an interlocal government corporation created by Hutto, and Preston Hollow Capital, LLC.[50]

In October 2020, the City voted, following an executive session with Palumbo, to hire outside attorneys to represent the City and "assert all claims as necessary including against Winstead law firm and/or McGinnis Lochridge firm arising out of the project known as Project Expansion. . ."[51]

Although the underlying agreements at issue in the Perfect Game litigation were *negotiated* before November 22, 2019 (the temporal stipulation date in the jury charge), the important point is that the new City Attorney was questioning *the validity of* the numerous former

---

[49] ROA.8563.

[50] ROA.5841-43, 5957-59, 5988-91, 5926-28, 7020, 7033-34.

[51] ROA.6980, 6983.

contracts and acts of the City **in 2020**, as both Snyder and Gordon testified.[52]

### 5. Budget Crisis and the Eide Bailly Audit.

In early 2020 shortly after Jones left, the City found itself with a budget shortfall.[53] After laying off 44 employees, the City hired an auditing company, Eide Bailly, to conduct an audit to learn where the City was spending its money.[54] The City hired the audit firm in the spring and then filled out questionnaires and met with the firm throughout the year.[55]

The official October 9, 2020 Eide Bailly report, "Examination of Severance and Settlement Payments," identified 16 employee "Transition Agreements.[56] It stated: "No City Council approval of Transition Agreements were identified within the City Council meeting minutes," and further, the agreements referred to "consultation compensation," but there

---

[52] ROA.5847-48, 5905, 5948-49, 5991, 6032.

[53] ROA.9000, 7546-47 (3/31/20 Statesman article).

[54] ROA.5835-36, 5939, 5992-94, ROA.6394-95 (Item 12.3), approved at ROA.8131(Item 9.3).

[55] ROA.5835.

[56] ROA.7796-97.

was no indication that employees had continued providing consulting services.[57]

The transition agreements had not been brought to Council, and their funding was not appropriated.[58] The audit confirmed that the City had gone below the minimum reserve requirement in the Charter.[59] In addition to the transition agreements, the report identified settlement payments, including the $630,000 settlement with Wolverine, citing that ongoing litigation.[60]

In September 2020, the Council declared the Non-Disclosure Agreement clause of the transition agreements void.[61] Snyder testified the City did not seek repayment of these smaller transition agreements for several reasons: first, because Jones sued the City within a week after the City rescinded Jones's Separation Agreement, which "slowed down the

---

[57] ROA.7796-97.

[58] ROA.5938-39, 5999, 9008.

[59] ROA.6037-38.

[60] ROA.7807-08, 7897-7902 (also showing a $115,000 payment to Emily Parks for settlement of her claims against Jones). *See* ROA.5912-14.

[61] ROA.5840, 6991 (Item 11.11), 6965 (Ordinance O-2020-029).

process, if you will, in terms of sending out demand letters."[62] In addition, a cost-benefit analysis did not justify the attorneys' fees to seek the small amounts paid in those agreements.[63] No evidence was offered to show the race of the former employees who had entered the transition agreements.

6. December 2020 Council Resolution Rescinding the Separation Agreement.

On December 3, 2020, the City Council voted unanimously (6-to-0) to rescind Jones's Separation Agreement in the form of Resolution No. R-2020-139.[64] The Resolution recited several findings, in conclusory language, to support the Council's actions, including (1) the Separation Agreement was unauthorized as required by law; and (2) the Agreement purported to impermissibly delegate legislative functions. The Resolution authorized the City Attorney to notify Jones of the Council action and to demand restitution of the severance payment. On December 4, 2020, City

_____

[62] ROA.5841, 5940-41, 9008.

[63] ROA.5940-42, 9008.

[64] ROA.7793.

Attorney Palumbo wrote Ted Smith, then-legal counsel for Jones, demanding restitution.[65]

On December 10, 2020, Jones filed this lawsuit.[66] The City filed no counterclaim; and Jones has never repaid the City any severance.

7. Removal of Commemorative Plaque.

At trial, Frankland testified about the City's removal of a commemorative plaque bearing Jones's name. He "believed" Tanner Rose was quoted in a press interview (never produced or presented at trial) stating "we wanted to remove a dark stain from the City of Hutto," a metaphor he understood to relate to Jones' tenure.[67] No trial exhibit showed the plaque, but Snyder described it as commemorating the construction of the City Hall edifice, bearing not only Jones's name but also that of the seven Council members, the architect, and the civil engineer who oversaw the construction.[68] The entire plaque and all names

---

[65] ROA.6212.

[66] ROA.24.

[67] ROA.5538.

[68] ROA.9013.

on it came down as one piece.[69] Frankland admitted that no Council action adopted any statement that the alleged "dark stain" remark related specifically to Jones.[70]

8.   Jones's Post-Hutto Employment.

Shortly after Jones separated from Hutto in November 2019, he worked as a consultant for the City of DeSoto until May or June of 2020.[71] In June or July 2020, Jones then secured employment as the City Manager for Missouri City, and that employment lasted until approximately July 2021.[72] After Missouri City, he worked in the real estate and construction industry, but claimed he was unable to get another city government job.[73]

B.   **Procedural Background**.

Initially, Jones asserted Section 1981 claims for racially-motivated breach of the 2018 Employment Agreement, a 2019 Consulting Agreement, and the 2019 Separation Agreement, Section 1981 claims for retaliation,

---

[69] ROA.9013.

[70] ROA.5547-48, 5552.

[71] ROA.5646-5647.

[72] ROA.5646-5647.

[73] ROA.5649-50.

Section 1985(2) conspiracy, retaliation under the Texas Whistleblower Act, and various common law torts. Jones sued the City and also three individuals – Snyder, Tanner Rose, and the then-City Manager, Warren Hutmacher.[74] During the course of the litigation, the Court dismissed all but the Section 1981/1983 and breach of contract claims against the City.[75]

The parties filed cross motions for summary judgment as to the validity of the contracts.[76] On February 16, 2023, the Court granted Jones's motion for summary judgment declaring the Separation Agreement valid and enforceable.[77]

The jury trial occurred between February 27 and March 2, 2023. At the close of all of the evidence, the City moved for judgment as a matter of law orally and in writing under Fed. R. Civ. P. 50(a), which the Court denied in relevant part.[78] Jones's Section 1981 claim for a racially-motivated breach of the Separation Agreement was submitted to the jury.

---

[74] ROA.24-79.

[75] ROA.1524-39, 4431-32, 4628-4650.

[76] ROA.1559-33710, 3413-3881.

[77] ROA.4431-32; *see also* ROA.5304-35 (hearing on cross motions); ROA.4628-4650 (supplemental order).

[78] ROA.4593-4604, 6061-76.

The Court separately submitted a claim under Texas contract law for breach of the Separation Agreement.[79]

The jury returned a verdict finding the City liable on Jones's Section 1981 and breach of contract claims, awarded him $8,000,000 for the alleged violation of his Section 1981 rights, and $4,500,000 for the alleged breach of contract.[80] On March 31, 2023, the Court entered a Final Judgment on the verdict.[81]

On April 18, 2023, the City filed a motion for judgment as a matter of law under FED. R. CIV. P. 50(b)[82] and a separate motion for new trial or remittitur under Fed. R. Civ. P. 59.[83] On January 11, 2024, the District Court denied the City's motion for JMOL but suggested a remittitur of the entire breach of contract damages award[84] and also ordered that Jones

---

[79] ROA.4624.

[80] ROA.4621-26.

[81] ROA.4651.

[82] ROA.4653-74.

[83] ROA.4675-4694.

[84] ROA.4916-72. The Court found that: 1) the jury charge on contract damages incorrectly included consequential damages barred by immunity under Chapter 271 of the Texas Local Government Code; 2) at least $500,000 of the amount included attorney's fees unsupported by the record; and 3) Jones offered

18

should remit $500,000 of the $8,000,000 jury award for Section 1981 damages on the ground that "the only evidence supporting attorney's fees [was] Jones's testimony," and that Jones could seek his attorney's fees by post-trial motion.[85] Jones accepted both remittiturs,[86] and has not appealed.

## IV. SUMMARY OF ARGUMENT.

Because claims against local governments for violations of Section 1981 must be brought under 42 U.S.C. § 1983, Jones needed to prove that the City itself violated a valid contract right not to disparage him and also that the City itself, acting through its final policymaker, breached that right because Jones is Black. The jury's verdict does not support liability on either element.

First, the Separation Agreement, and particularly the non-disparagement provision, is not a valid agreement. Cities cannot by contract waive governmental immunity from tort suits; that is a state legislative function. But in any event, the City did not disparage Jones.

---

to remit the award for breach of contract. ROA 4954-57, 4971-72.

[85] ROA.4966.

[86] ROA.4973.

The alleged statements of Councilors Snyder and Rose were private, unauthorized comments not attributable to the City.

Second, Jones failed to show any racially discriminatory breach by the City Council in rescinding the Separation Agreement or in disparaging Jones. The Council voted unanimously to end the Agreement on colorable legal advice of its City Attorney, Palumbo. No evidence was adduced to show that a majority of those voting for the resolution harbored racial animus in casting their votes. The District Court's resort to Title VII cat's paw causation analysis is contrary to the Supreme Court's requirement that the policymaker itself be shown to have acted with an improper motive. No evidence showed pretext by disparate treatment favoring any "similarly situated" non-Black person.

The damage award is also unsupported by any evidence or is manifestly excessive. No evidence showed that any disparagement whatsoever, let alone any disparagement the City itself published about Jones, caused him any reputational injury. His hurt feelings alone are not actionable. Hence, if the liability finding must stand, the Court should award only nominal damages or suggest a large remittitur.

## V.  ARGUMENT.

### A.  Essential Elements of Municipal Liability for Section 1981 Violations.

To establish a claim of discrimination under 42 U.S.C. § 1981, a plaintiff must show (1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned the performance or termination of contracts. *Arguello v. Conoco*, 330 F.3d 355, 358 (5th Cir. 2003); 42 U.S.C. § 1981 (a)-(b). The plaintiff bears the burden of proving that "race was a but-for cause of [his] injury." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (U.S. 2020).

Recovery against a municipality for violation of Section 1981 must be sought pursuant to 42 U.S.C. § 1983. *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989); *Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 462-63 (5th Cir. 2001). "[A] city is not liable under § 1983 on the theory of *respondeat superior*." *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "[U]nder § 1983, local governments are responsible only for their *own*

illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis original; internal quotations omitted).

Municipal liability under § 1983 thus "requires proof of three elements in addition to the underlying claim of a violation of [Section 1981] rights: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005) (internal quotations omitted).

The relevant city policymaker for terminating the Severance Agreement is Hutto's City Council. *See* CHARTER, at §§ 4.01(c), 13.07.[87] To evaluate whether a collective body such as the Hutto City Council acted illegally (*i.e.*, with racially discriminatory intent), plaintiff must show that a majority of the Council – four of the votes – were tainted by intentional race discrimination. *See, e.g., Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir.) (holding trial judge erred in denying Rule 50 motion on Section 1983 claim in the absence of "any evidence showing that a majority

---

[87] ROA.7721, 7743

of the members of the . . . Planning Commission . . . acted with an unconstitutional motive"), *cert. denied*, 549 U.S. 1020 (2006).[88]

Jones contended the City breached the anti-disparagement provision of the Severance Agreement through comments made by two members of the City Council, Snyder and Rose. Putting aside for the moment whether the Agreement holds the City responsible for alleged disparaging comments by individual council members – which it does not – the Section 1983 municipal liability question is whether and how any such comments by individuals can constitute a "policy" of the City's final policymaker. Texas law is clear that no individual council member can speak for a city without approval and actual authorization of the governing body. *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 678 (Tex. 2004) ("improvident statements of individual officials and employees . . .and motives of those individuals are not those of the City itself") (citing with approval *City of Corpus Christi v. Bayfront Assocs.*, 814 S.W.2d 98, 105

---

[88] *See also LaVerdure v. Cnty. of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003); *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 262 (6th Cir. 2006).

(Tex. App.—Corpus Christi 1991, writ denied); *City of Denton v. Grim*, No. 22-1023, 2024 Tex. LEXIS 318, *10 (Tex. May 3, 2024).

That a city official is a member of the governing body does not, without more, establish that such councilor acts for that city as its final policymaker. *See Advanced Technology Building Solutions, L.L.C. v. City of Jackson*, 817 F.3d 163, 166 (5th Cir.) (mayor's power to recommend funding decisions held not to create final policymaking authority where city council collectively held the power of the purse over the city budget), *cert. denied*, 580 U.S. 917 (2016); *see also Worsham v. City of Pasadena*, 881 F.2d 1336, 1337, 1340-41 (5th Cir. 1989) (mayor's suspension of city employee not attributable to the city).

## B. The City Is Entitled to Judgment as a Matter of Law on Liability.

### 1. <u>Standard of Review</u>.

The standard of review of a ruling on a Rule 50(a) motion for judgment as a matter of law ("JMOL") is *de novo*. *Young v. Bd. of Supervisors*, 927 F.3d 898, 903 (5th Cir. 2019). "'A JMOL is appropriate when 'a reasonable jury would not have a legally sufficient evidentiary

basis to find for the [non-moving] party on that issue.'" *Id.* (quoting FED. R. CIV. P. 50(a)).

"When a case is tried to a jury, a motion for JMOL is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Young*, 927 F.3d at 903 (internal quotations and brackets deleted). "[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)):

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

*Anderson*, 477 U.S. 242, 252.

## 2. No Valid Contractual Interest Proven.

"Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship' . . . under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). The District Court ruled on cross motions for summary judgment that the Separation Agreement is a valid and enforceable contract.[89] That ruling was error for two reasons.

First, the Severance was void under Section 8.10 of the City Charter. In relevant part it provides:

> No payment shall be made or obligation incurred against any allotment or appropriation except in accordance with authorized appropriations **and unless the City Manager or his designee first certifies that there is a sufficient unencumbered balance in such allotment or appropriation and that sufficient funds are or will be available to cover the claim or meet the obligation when it becomes due and payable**. Any authorization of payment or incurring of obligation in violation of the provisions of this Charter **shall be void** and any payment made shall be illegal.[90]

---

[89] ROA.4431.

[90] ROA.7735 (emphasis added); *see also* Charter, § 1.01 ("All power of the City shall be exercised in the manner prescribed by this Charter. . .").  ROA.7713.

A city charter is a city's organic law, and therefore, a city cannot create contract rights contrary to the charter. *See Henderson v. Sotelo*, 761 F.2d 1093, 1096 (5th Cir. 1985). The City used the modified accrual method for budgeting[91] – revenues recognized when money is available and expenditures recognized when liabilities are incurred. The Budget for FY 2019-20,[92] adopted on October 1, 2019, shortly before the Separation Agreement was entered, showed the City Manager's salary to be funded out of the general fund;[93] and the general fund budget showed expenses outpacing revenues and a diminishing fund balance.[94]

The FY 2019-20 Budget provides: "The City Manager may move appropriations from account to account; however, budget amendments resulting in a decrease or increase of total appropriations must be approved by ordinance by the City Council."[95] When the City Council approved the $412,000 severance for Jones, a monthly obligation to be paid

---

[91] ROA.6304.

[92] ROA.6259.

[93] ROA.6279, 6287, 6302.

[94] ROA.6304.

[95] ROA.6278.

out over a full year was converted into a single lump sum payment. No contingency was made for additional monies to pay a replacement city manager over the course of the year, yet one was hired.[96]

The summary judgment record fails to show that the severance pay obligation complied with Section 8.10 of the Charter – that the City Manager or his designee first certified a sufficient unencumbered balance in such allotment or appropriation and that sufficient funds were or would be available to cover the obligation. To "certify" means "[t]o authenticate or vouch for a thing **in writing**. To attest as being true or as represented." BLACK'S LAW DICTIONARY, 207 (West 5th ed. 1979)(emphasis added).

Palumbo testified that a document would need to be created by the City Manager (or his designee) indicating that a sufficient unencumbered balance was available.[97] She looked for such a document but found none.[98] No such document was admitted in the trial record either.

Second, the Separation Agreement was voidable under the Texas Open Meetings Act ("TOMA"), whose purpose is "to enable public access

---

[96] ROA.7619.

[97] ROA.1731.

[98] ROA.1730-32.

28

to and to increase public knowledge of government decisionmaking." *City of San Antonio v. Fourth Court of Appeals*, 820 S.W.2d 762, 765 (Tex. 1991). To this end, TOMA requires that a "governmental body shall give written notice of the date, hour, place, **and subject** of each meeting held by the governmental body." TEX. GOV'T CODE § 551.041 (emphasis added). An action taken by a governmental body in violation of TOMA is "voidable." *Id.*, at § 551.141.

The agenda item for action taken at the meeting on the Separation Agreement, states:

> 13.A. Consideration and possible action(s) on **personnel matters** regarding city manager.[99]

TOMA does not define the "notice" the public must be given of the "subject" of a meeting. But the Texas Supreme Court determines adequacy of the notice from the perspective of the "reader" of the meeting agenda who is a "member[] of the interested public." *City of San Antonio*, 820 S.W.2d at 765. "The test is whether a notice is sufficiently specific to alert the general public to the topic to be considered." *Odessa Tex. Sheriff's*

---

[99] ROA.7779 (emphasis added).

*Posse, Inc. v. Ector County*, 215 S.W.3d 458, 472 (Tex. App.—Eastland 2006, no pet.).

The required specificity varies with the topic of the meeting – notice must be more specific if the public has a special interest in the topic under discussion. *See Cox Enters., Inc. v. Bd. of Trs. of Austin Indep. Sch. Dist.*, 706 S.W.2d 956, 959 (Tex. 1986). Where the topic is of special interest, "less than full disclosure is not substantial compliance." *Id*. at 959-60. The content of the notice is compared with the action taken at the meeting. *Rettberg v. Texas Dep't of Health*, 873 S.W.2d 408, 412 (Tex. App.—Austin 1994, no writ).

Here, the Separation Agreement involved substantially more than a simple "personnel matter." It called for the secret payment of an unbudgeted $412,000 of severance pay, a release *by the City* of all claims *the City might have* against Jones during a period in which the City was embroiled in numerous suits over transactions Jones had managed; a post-employment confidentiality provision binding the City to disclose nothing about the Agreement in the future; and perhaps even more significantly, a non-disparagement provision purporting to waive the City's

governmental immunity from unlimited tort liability for anything "disparaging" the City might say in the future about Jones, even after he had left the City's employment.

This purported waiver of tort immunity by contract was also an improper municipal usurpation of state legislative power. *See Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002) ("This Court has long recognized that 'it is the Legislature's sole province to waive or abrogate sovereign immunity.'") (quoting *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 409 (Tex. 1997)).[100] Texas Tort Claims Act affords no waiver of immunity from intentional torts. *See* TEX. CIV. PRAC. & REM. CODE § 101.057(2); *Delaney v. Univ. of Houston*, 835 S.W.2d 56, 59 (Tex. 1992). The Texas Local Government Contract Claims Act contains a similar exclusion. TEX. LOCAL GOV'T CODE § 271.157. So too does the Hutto City Charter. *See* HUTTO CHARTER, § 13.08 ("[N]othing herein contained shall be construed to mean the City waives any rights, privileges, defenses or immunities in tort actions which are provided under the common law,

---

[100] ROA.7744.

the constitution and laws of the state of Texas.").[101] Thus, even if the severance payment was contractually valid, the anti-disparagement provision was not.

3. <u>No Impairment of Contractual Relationship by the City</u>.

The District Court erred in denying the City's motion for JMOL, since, for the following reasons, no legally sufficient evidence supports the jury's finding that the City impaired any of Jones's contractual rights.

(a) *The City's rescission of the Separation Agreement did not impair Jones's rights because Jones received his Severance Pay.*

The City fully paid the $412,000.00 severance payment promised to him under the Severance Agreement[102]; and while the City demanded that the payment be returned and threatened suit if it were not, the City filed no counterclaim seeking restitution.

---

[101] The Texas Supreme Court has questioned but never decided whether a city is authorized to waive its own immunity in cases where, as here, a legislative bar is available. *See Tooke v. City of Mexia*, 197 S.W.3d 325, 344 (Tex. 2006).

[102] ROA.4611.

(b) *The City did not "disparage" Jones.*

The City did not impair Jones's contract rights by "disparaging" him in violation of the non-disparagement provision of the Separation Agreement. Although the Separation Agreement was vaguely worded to apply to "any derogatory comments," the Court's Charge defined "disparagement" as defamation actionable under the "actual malice" standard – "when a person publishes a disparaging false statement about the person, and, when she publishes the statement, she knows the falsity of the statement or acts with reckless disregard of whether the statement is false or acts with ill will or intends to interfere with the economic interest of the other person."[103]

Jones claimed the Resolution itself violated the non-disparagement provision.[104] It does not.

For one thing, the Resolution was absolutely privileged speech – a statement approved in the course of a city council meeting relative to a proposed judicial proceeding. *See* RESTATEMENT (2d) OF TORTS § 587 ("A

---

[103] ROA.4612.

[104] ROA.5686-87.

party to a private litigation… is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding… if the matter has some relation to the proceeding.") (approved by *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 46 (Tex. 2021)); *see also South Padre Island v. Jacobs*, 736 S.W.2d 134, 143-44 (Tex. App.—Corpus Christi 1987, writ denied) (op. on reh'g) (absolute quasi-judicial privilege attached to statements made in city council meeting regarding reasons for termination of city manager); *Village of Bayou Vista v. Glaskox*, 899 S.W.2d 826, 829 (Tex. App.—Houston [14th Dist.] 1995, no writ) (same).[105]

Moreover, the Resolution was not a false statement of fact "about" Jones, but rather, a statement about the legal reasons why the City was rescinding the Separation Agreement – non-actionable opinion. *See Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018) ("even

---

[105] *See BancPass, Inc. v. Highway Toll Admin., L.L.C.*, 863 F.3d 391, 397 (5th Cir. 2017) (holding that Texas' judicial proceedings privilege acts as a complete immunity from suit and is immediately appealable, noting Texas cases); *James v. Brown*, 637 S.W.2d 914 (Tex. 1982) (letter written by physician in contemplation of proceedings was absolutely privileged and did not give rise to suit for defamation); *Daystar Residential, Inc. v. Collmer*, 176 S.W.3d 24, 27 (Tex. App.–Houston [1st Dist.] 2004, pet. denied) (attorney's statements while suit was being contemplated were not subject to suit for disparagement).

when a statement is verifiable as false, it does not give rise to liability if the 'entire context in which it was made' discloses that it is merely an opinion masquerading as a fact."); *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 435 (E.D.N.Y. 2013) ("Courts have repeatedly held that an accusation that a party has breached a contract or other legal agreement is not defamatory per se unless the declarant has made or implied additional defamatory assertions of fact.") (citing cases).

There is also no evidence to show that a majority of the six Hutto Council members who voted for the Resolution did so with actual malice as to the truth or falsity of any factual assertions.

The only other statement attributable to the City as such was City Attorney Palumbo's December 4, 2020 letter to Jones's attorney, Ted Smith. That letter fails to constitute "disparagement" for the same reasons that the Resolution does — it is an absolutely privileged legal opinion, made in contemplation of possible litigation, and no malice is shown. Further, since no evidence exists to show that the City itself published Palumbo's letter to anyone other than to Jones's own lawyer, Smith, it is effectively no publication at all. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572,

579 (Tex. 2017) (publication must be to a third person); *Renfro Drug Co. v. Lawson*, 138 Tex. 434, 160 S.W.2d 246, 250 (Tex. 1943) (no publication where statement was to plaintiff's attorney).

Jones testified he saw Palumbo's demand letter "as well as the other resolutions and stuff being posted out there on social media accounts with elected leaders. And like I said, it says Mayor, City of Hutto, and they're speaking for the City." But when asked if he had a specific document evidencing what "he saw," Jones said he sent it to his attorneys; the information he saw was not posted on any official city website, such as huttotx.gov; but rather, he saw the letter on an account "that said on it Mayor and Councilmember Facebook account posting is what I saw."[106] When asked what evidence he had to support his belief that the Facebook account was controlled by the City of Hutto, Jones stated "I don't know."[107]

Accordingly, neither the Resolution, nor Palumbo's demand letter to Jones's attorney, can constitute the basis for Jones's disparagement claims.[108]

---

[106] ROA.5688-89.

[107] ROA.5689.

[108] ROA.4598-4600 (¶¶15-16, 19).

36

(c) *Alleged stray remarks of Councilmen Snyder and Rose were unauthorized by and thus cannot be attributed to the City.*

The non-disparagement provision of the Separation Agreement binds only the City to refrain from disparagement: "Hutto agrees not to disparage, make any derogatory comments, whether written or oral, against Jones."[109] The City did not agree to be responsible for unauthorized remarks of individual Council members, such as Snyder or Rose. Yet the District Court, contrary to *Monell* and Texas law drawing a clear line between the acts of a city and the unauthorized statements of city council members, erroneously conflated the City with the unauthorized remarks of those two individuals.

Texas law holds that an individual council member's unauthorized statements cannot be regarded as a statement of the city itself. "Unlike employees or other agents whom the law or the city council has given legal authority to act for the city, the actions of a lone council member are generally not the actions of the city itself. Nor are violations of law by a lone council member violations of law by the city." *City of Denton v. Grim*,

---

[109] ROA.6189.

2024 Tex. LEXIS 318,*10 (and cases cited). Only if a majority of the city council authorizes a single member of the council to take various actions on behalf of the city may the council member's actions be imputed to the city. *Id.*, 2024 Tex. LEXIS 318, *12.

No such scenario was proven in this case. "[P]roof of the governing body's acts may only be supplied by the authenticated minutes of the meeting at which the action occurred, unless the minutes have been lost or destroyed." *City of Bonham v. Southwest Sanitation*, 871 S.W.2d 765, 767 (Tex. App.—Texarkana 1994, writ denied). In moving for judgment as a matter of law, the City contended, and showed, no minute order, resolution, or ordinance of the Council authorized any of the allegedly disparaging statements Jones attributed to Snyder and Rose.[110]

Indeed, because alleged social media activity of Snyder and Rose received no imprimatur from the Council, the comments were not made under "color of law" within the meaning of Section 1983. *See Lindke v. Freed*, 601 U.S. 187, 198 (2024) ("[A] public official's social-media activity constitutes state action under §1983 only if the official (1) possessed *actual*

---

[110] ROA.5547-48, 5583-84, 6029, 4596-99, 4657-64, 5632-34, 5881-82.

*authority to speak on the State's behalf*, and (2) purported to exercise that authority when he spoke on social media.") (emphasis added); *see also Kallinen v. Newman*, No. 22-20383, 2023 U.S. App. LEXIS 7240, 2023 WL 2645555 at *2 (5th Cir. Mar. 27, 2023) (affirming dismissal of § 1983 free speech claim where plaintiff failed to "satisfy his burden of pleading acts sufficient to show that Judge Newman's page was an official page, and that the Judge was acting in his official capacity when he deleted [plaintiff's] comments.").

In this case, Jones pointed to Snyder's and Rose's "press release" posted on November 25, 2019, four days after the vote on the Separation Agreement, but he did not show it to be authorized by the City. It was posted by Snyder and Rose as a personal statement, as Snyder testified: "It was just more to relay that I didn't know what was going on, necessarily, but I didn't support it."[111] Snyder did not ask the City if he could post the press release. The City did not pay for it or give permission

---

[111] ROA.5923.

to post it.[112] The City, by contrast, posted a press release that lauded Jones's service.[113]

Several of the stray remarks heard around City Hall – Snyder and Rose allegedly saying that Jones "was a crook," or that they believed he had received kickbacks from developers and contractors, or had "robbed the city blind" – were never tied to any authorizing action of the Council. During trial, Frankland testified that Snyder and Rose posted negative comments "on Facebook pages" (which the District Court ruled was hearsay), about Jones in 2020 after he went to work at Missouri City.[114] Hearsay cannot create a fact issue and, in any event, does not show actual authorization by the City. *See Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2020) ("Inadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis'" under Rule 50) (quoting FED. R. CIV. P. 50(a)(1)). Frankland admitted:

> Q. Did the city council ever pass a minute order, resolution, or ordinance to post things on Facebook?

---

[112] ROA.5924.

[113] ROA.7622.

[114] ROA. 5531-32.

A. No.

Q. Did the city council, by minute order, resolution, or ordinance, require or direct staff to any city council member to contact Missouri City?

A. No.[115]

Frankland also testified that Jones told him that *Snyder* and *Rose* were "harassing him via Facebook and *I believe* the City of Missouri Facebook – or page, as well,"[116] But no exhibit shows any disparaging statements on any City of Hutto Facebook page or website; and no testimony even identifies an official City of Hutto Facebook page or website on which any of these unauthorized comments were allegedly posted. On motion for JMOL, the unsubstantiated belief of a witness is incompetent to establish a material fact. *See Herron v. Maryland Casualty Co.*, 347 F.2d 357, 358 (5th Cir. 1965); *see also Templeton v. Luckett*, 75 F. 254, 259 (5th Cir. 1898) ("A belief of the witness, however well founded, cannot be regarded as evidence.").

---

[115] ROA.5552.

[116] ROA.5533.

Neither the District Court nor the jury found that Snyder or Rose had actual authority to speak on behalf of the City of Hutto, and the evidence does not support such a finding. Jones thus did not meet his burden to show that the alleged statements by Snyder and Rose were state action or statements of and by the City. Thus, the District Court erred in relying on these stray remarks to support its denial of the City's motion for JMOL.

4. <u>No Proof of Race Discrimination by the City Council</u>.

(a) *No proof exists to show four Council votes were tainted by racism.*

To prevail in a Section 1981 case, a plaintiff must ultimately prove that, but for race, he would not have suffered the loss of a legally protected right. *Comcast Corp.*, 140 S. Ct., at 1019. No legally sufficient evidence supports the jury's finding of race discrimination on the part of the City.

As noted above, Jones's burden to prove municipal liability required proof that the final policymaker, the City Council, voted to rescind the Separation Agreement because Jones is African-American. The six members of the Council voted unanimously to rescind the Agreement. Only three of the members of the Council who participated in that vote testified

at trial – Snyder, Gordon, and Thornton. They voted to rescind the Agreement because the City Attorney, Dottie Palumbo, advised the Council it was a void agreement.[117]As Gordon testified:

> For me the primary motivating factor in voting to rescind that agreement was an invalid agreement and that we really had no choice. That it legally couldn't stand on its own. We were advised that we really had no choice. This was not a legally done document.[118]

The other three members of the Council – Tanner Rose, Patti Martinez, and Robin Sutton did not testify at trial.

No attempt was made to show that four of the six Council members – Gordon, Thornton, Martinez, and Sutton – had any racial bias against Jones. Indeed, Martinez and Gordon voted to replace Jones as City Manager with a Black man.[119]

---

[117] ROA.5970 (Snyder), 6033 (Gordon), 6051-52 (Thornton) ("the main concern was the contract we were told was not entered into legally; that the money was not budgeted and allocated for that purpose; and so the money should not have been spent, because it needed to be budgeted and allocated before it could be spent.").

[118] ROA.6033.

[119] ROA.7619.

The evidence cited by the District Court to support racism on the part of the City Councilors or Dottie Palumbo is nothing more than a showing of guilt by association with Snyder. Simply "going along with" the vote or recommendation of another does not create an inference that the same motive is imputed to all. *Cf. Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009) ("a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality"); *Milam v. City of San Antonio*, 113 F. App'x 622, 627 (5th Cir. 2004) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)).

Tanner Rose, who did not testify, was alleged to be politically aligned with Snyder on many issues, but no probative evidence was adduced to show that Rose made any racially hostile remarks or took issue with Jones for racially-motivated reasons. Rose's alleged "dark cloud" remark in conjunction with taking down the commemorative plaque at City Hall is an ambiguous metaphor, not probative of racial hate.[120]

---

[120] *Boyd v. State Farm Ins.*, 158 F.3d 326, 329 (5th Cir. 1998) ("mere utterance of a racial epithet is not indicia of discrimination"); *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457 (5th Cir. 2019) (to rise above the level of a stray remark, the comment must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or

Therefore, four (if not five) of the six voted to rescind the Separation Agreement were not proven to be racially motivated, and thus, judgment as a matter of law should have been granted for the City on Jones's race discrimination claim. *See Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 476 (5th Cir. 2005) (reversing jury verdict where plaintiff failed to rebut employer's reliance on police officer's statement, and stating "Management does not have to make proper decisions, only nondiscriminatory ones.").[121]

(b)  *Cat's Paw does not exist on the law or facts.*

The District Court erred in assuming that a cat's paw theory of causation is applicable in a Section 1983 case such as this. *See Praprotnik*, 485 U.S. at 127 ; *Beattie v. Madison County School District*, 254 F.3d 595 (5th Cir. 2001).

---

presumptions that discrimination was an impermissible factor in the adverse action decision to terminate the employee).

[121] The issue of Snyder's motive presents a closer question, because under the applicable standard of review the racially-invidious statements attributed to him by Jones and Frankland, though denied by Snyder, must be assumed true. However, Snyder's alleged stray remarks are not connected in time or content to the City Council's collective decision to rescind the Separation Agreement, and thus, are insufficient to prove that Jones's race motivated even Snyder's vote on that matter. *See Boyd*, *supra.*

In *Praprotnik*, the Supreme Court endorsed the notion that a municipality may be held liable under Section 1983 through a ratification theory. *Praprotnik*, 485 U.S. at 127. But to ratify the decision of a non-policymaker, "the authorized policymakers [must] approve a subordinate's decision **and the basis for it**." *Id.* (emphasis added).

Accordingly, in *Beattie*, a school secretary brought suit alleging she was fired for opposing the superintendent's reelection. The focus of the appeal was on the question of municipal liability, which attaches only if final decisionmakers are liable. 254 F.3d at 602. The unconstitutional motives of the principal and superintendent who recommended the termination were not attributed to the school board that made the final decision because the board did not know about the plaintiff's First Amendment activity. *Id.* at 603-04. The Court also noted that the plaintiff failed to impugn the school board's facially legitimate motives: "even if the board adopted their recommendation, that recommendation exhibited no unconstitutional motive on its face. Further, **the evidence suggests that the board fired Beattie for independent reasons, and Beattie offers**

**nothing but her own beliefs to the contrary**." *Beattie*, 254 F.3d at 605 (emphasis added).

In this case, the District Court appears to have read the "and the basis for it" language right out of *Praprotnik*, which this Court should decline to do. *Waters v. City of Chicago*, 580 F.3d 575, 585 & n.2 (7th Cir. 2009) (questioning whether "cat's paw" theory, based on agency principles, is applicable for establishing § 1983 municipal liability, where the policymaker must be the wrongdoer). But even if a cat's paw theory were applicable, which it is not, no legally sufficient evidence exists to support liability under that theory.

The City Council must vote as a body to hire and fire its city attorney.[122] No evidence exists about the vote to terminate the McGinnis Lochridge law firm, although abundant evidence exists of attorney misfeasance in the form of huge fees on battles with the Attorney General on Public Information Act requests for records of city dealings and the firm's failure to provide requested information to the City along with other

---

[122] Hutto Charter, at §§ 4.01(a), (c) (ROA.7721).

litigation that had its genesis during the firm's service.[123] No evidence shows that Palumbo held any racial animus or was hired because she came to the interview "selling" her opinion that the Separation Agreement was invalid. Nearly a year passed between the time of her appointment in February 2020, and the December 2020 Resolution she recommended.

The theory that Snyder and Tanner Rose somehow chose Palumbo because they knew she would serve up a legal pretext for revoking the Separation Agreement is an improper stacking of inference upon inference that cannot and does not prove discrimination on the part of the City Council majority. *See Bryant*, 413 F.3d at 477–78 (plaintiff's cat's paw conspiracy theory failed "because he offered no evidence that the official decisionmakers were involved in the conspiracy, knew about the conspiracy, or should have known about the conspiracy").

(c)  *No similarly situated comparator was shown.*

The District Court used other Title VII disparate treatment principles – comparative treatment to a claimed "similarly situated" employee – to support the claimed inference that the Hutto City Council

---

[123] ROA.5946-49, 6012-13, 6024, 6028, 6031.

in December 2020 treated Jones differently than the City treated another city manager, Karen Daly, who was Jones's predecessor and resigned before Jones was appointed in 2016.

The Fifth Circuit has "defined 'similarly situated' narrowly, requiring the employees' situations to be 'nearly identical.'" *West v. City of Houston*, 960 F.3d 736, 740 (5th Cir. 2020). "Employees are similarly situated when they (1) 'held the same job or responsibilities,' (2) 'shared the same supervisor or had their employment status determined by the same person,' and (3) 'have essentially comparable violation histories.'" *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (footnotes omitted).

The District Court relied on the fact that a former city manager, Daly, resigned and was paid severance. But this separation agreement is was not shown to be comparable. Daly's separation agreement is not in evidence; so there is no way to determine whether her agreement suffered from the same procedural and technical flaws as those in Jones's 2019 Agreement that the new City Attorney found invalidating. In addition, the decisionmakers were not proven to be the same. There is no set of council minutes in the record to show who served on the City Council when Daly

resigned, but the minutes do show that the Council even as late as 2018 was completely different than the Council in December 2020 that rescinded Jones's Separation Agreement.

Critically on this point, no evidence exists to show that the City Attorney who recommended the invalidation of Jones's Agreement – or any of the members of the Council itself – had any knowledge of Daly's Separation Agreement. Thus, what happened with Daly's separation cannot support any legitimate inference that the Council in 2020 treated Jones differently on account of his race. *See Lane v. Riverview Hosp.*, 835 F.3d 691, 697 (7th Cir. 2015) ("If the supposedly common decision-maker was not even aware of the comparator, then a court cannot infer intentional discrimination from the different treatment."); *see also Landry v. Lincare, Inc.*, 579 Fed. Appx. 734, 737 (11th Cir. 2014).

5. <u>No Proof to Support Any Actionable Breach of Contract Claim</u>.

While the Court appears to have agreed with the City's argument that the contract damages were erroneously submitted to the jury,[124] it is

_____

[124] *See* ROA.4955 ("Texas law prohibits consequential damages of the nature of jury instruction number 3").

unclear whether the court's remittitur constitutes a ruling on this basis. Therefore, in an abundance of caution, Hutto asserts that the court erred in denying its Rule 50(b) and 59 motions as to liability for breach of contract. In this regard, the City adopts by reference its contract-based arguments above (*see supra*, pp. 26-42).In addition, the claimed damages in this case are barred by governmental immunity. Hiring and firing employees is a governmental function. *City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex. 1995); *Gillum v. City of Kerrville*, 3 F.3d 117, 122 (5th Cir. 1993). The Local Government Contract Claims Act does not allow recovery of "consequential damages" to reputation or emotional distress in a contract suit. TEX. LOC. GOV'T CODE § 271.153(b); *Zachry Const. Corp. v. Port of Houston Auth. of Harris Cnty.*, 449 S.W.3d 98, 108 (Tex. 2014); *see also Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 214 (5th Cir. 1998) (reputational injury is a form of consequential damage not ordinarily recoverable in a contract suit). Therefore, Jones's claim for consequential damages for breach of the non-disparagement provision is barred by governmental immunity.[125]

---

[125] Texas local governmental immunity is jurisdictional and can be asserted at any time. *See Smit v. SXSW Holdings, Inc.* 903 F.3d 522, 530 (5th Cir. 2018).

### C. No Evidence Supports the Damage Award.

#### 1. Section 1983 Damages Law.

"[T]he basic purpose" of § 1983 damages is "to compensate persons for injuries that are *caused by* the deprivation of [protected federal] rights." *Carey v. Piphus*, 435 U.S. 247, 254 (1978) (emphasis added). "[P]rinciples of causation borrowed from tort law are relevant to civil rights actions brought under section 1983." *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1996) (alteration and internal quotation marks omitted); *see also Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986). "Section 1983 does require a showing of proximate causation, which is evaluated under the common law standard." *Murray v. Earle*, 405 F.3d 278, 290 (5th Cir. 2005). Accordingly, "[c]ausation in fact – *i.e.*, proof that the defendant's conduct did in fact cause the plaintiff's injury – is a standard requirement of any tort claim." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346 (2013); *see also* Jury Charge (requiring proximately causal nexus between Jones's damages and City's denial of rights).[126]

---

[126] ROA 4615, 4624.

"[C]ivil rights plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was caused by a municipal policy or custom." *Los Angeles County v. Humphries*, 562 U.S. 29, 30-31 (2010). Thus, Jones needed to show that his recoverable damages were proximately caused by *the City's* alleged discriminatory acts, not the unauthorized actions individual council members acting privately or without the Council's imprimatur. This showing he failed to make.

### 2. No Evidence (or Factually Insufficient Evidence) Supporting Section 1983 Economic Damages.

Jones had no economic damages – he kept the $412,000 received under the Separation Agreement, and the $500,000 remittitur represented Jones's ballpark testimony of attorneys' fees, which the court has allowed Jones to seek separately by post-judgment motion.[127]

### (a) *Damages Lack Casual Link.*

No legally sufficient evidence connects any specific, disparaging statements *of the City* with a specific loss of a job opportunity to Jones. In addressing the Section 1981 (1983) damages, the District Court justified over half of the jury's $7.5 million dollar award based on Jones's alleged

---

[127] ROA.4611 (Stipulation #12), 4956, 4966, 4972.

reputational injury.[128] However, no evidence showed that the Resolution or demand letter – the only two acts attributed to the City[129] – were published to anyone other than to Jones and his attorney, let alone to any prospective employer. *See Tercero v. Texas Southmost Coll. Dist.*, 989 F.3d 291, 300 (5th Cir. 2021) (affirming district court's grant of judgment as a matter of law on ground that plaintiff did not show plaintiff's due process violation caused claimed loss of new employment opportunity); *Hopkins v. Stice*, 916 F.2d 1029, 1031-32 (5th Cir. 1990) (reversing jury verdict because no evidence showed supervisor caused plaintiff's alleged loss of reputation).

As discussed, the statements attributable to Snyder and Tanner Rose were not attributable to the City. Jones's testimony that he had "a hard time finding another city management job" and "lost a lot of wages" is not evidence of economic damages ***caused by*** the City – or even by the unauthorized comments or publicity surrounding the development disputes and litigation in which Hutto found itself. *See Univ. Computing*

---

[128] *See* ROA.4959-60.

[129] The District Court agreed. ROA.5634; *see also* ROA.5882-5883.

*Co. v. Mgmt. Sci. Am., Inc.*, 810 F.2d 1395, 1402 (5th Cir. 1987) (opinion testimony is "insufficient as a matter of law to establish causation" and "any inference drawn therefrom is merely speculative" where the testimony "is no more than a well-informed guess").

Jones started work at Missouri City months before the December 3, 2020 Resolution was enacted, and he left Missouri City in approximately **July 2021,** *seven months after* it was enacted.[130] Thus, neither the December 2020 Resolution nor Frankland's hearsay testimony about vague Facebook activity in 2020, are close enough in time to support an inference that such statements caused Missouri City to part ways with Jones over seven months later. *Cf. Besser v. Texas Gen. Land Off.*, 834 F. App'x 876, 885 (5th Cir. 2020) (holding two and one-half months between protected activity and adverse employment decision, standing alone, was not within "very close" proximity necessary to establish causation) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). Snyder's and Rose's "press release" post of November 2019 (also not a statement of the City) was even more attenuated in time.

---

[130] ROA.5644-47, 7793.

Presumably, to show that Missouri City fired Jones because of some act of disparagement by the City of Hutto, Jones would have needed to show (1) a disparaging statement attributable to Hutto, (2) which the Missouri City Council knew about, and (3) a majority of the Missouri City Councilors voted to fire Jones because of the Hutto statement.[131] No such evidence was adduced.[132]

The simple fact that both City of De Soto and Missouri City hired Jones (Missouri City six months after he left Hutto) weighs against the inference of any reputational injury, and his subsequent employment (without proof of why he left) acts as a superseding cause that cuts off Hutto's liability for any such harm. *See, e.g., Murray*, 405 F.3d at 290–91 (applying common law tort principle of superseding cause in Section 1983 case) (citing RESTATEMENT (2d) OF TORTS § 440–41 (1965)). Both Jones and Hutto's former city attorney, Bingham, testified that turnover in City

---

[131] Missouri City's city manager can be fired only on a vote of the Council. *See* MISSOURI CITY CITY CHARTER, § 4.01(C), accessed online at https://library.municode.com/tx/missouri_city/codes/code_of_ordinances?nodeId=PTICH_ARTIVADSE_S4.01CIMA. This Court can take judicial notice of the Missouri City Charter published on that city's official website. *Huskey v. Jones*, 45 F.4th 827, 831 n.3 (5th Cir. 2022) (and cases cited).

[132] When Jones was asked why he left Missouri City, the Court sustained the City's hearsay objection. ROA.5648-49.

Manager positions was commonplace, due to changing political winds and city council positions by election.[133] Jones also admitted that it was "commonplace" and part of his profession to have transition of leaders after an election because the new leader or council has a different vision. "Indeed, Jones testified, "It's just a part of the profession, that happens all the time. And in state government it happens if you got a new governor and it's just how it happens."[134]

In awarding enormous economic damages, the District Court relied on Jones's self-serving, uncorroborated testimony about a "Seguin representative's" statements to Jones.[135] Jones testified that in March or April 2021 (while still employed at Missouri City), he was "trying to do a deal with the City of Seguin," and "the City manager brought to my attention that he was concerned about doing business with me about whether or not I was ethical based off the unethical allegations out of

---

[133] ROA.5651, 5770.

[134] ROA.5651.

[135] ROA.4960 (citing ROA.5704).

Hutto of misappropriation of funds and all that and that lowered my professional standard."[136]

This hearsay should be disregarded;[137] but even if credited, it fails to forge a legally sufficient link between any racially-motivated disparaging statement of the City of Hutto and a job offer Jones would have received from the City of Seguin "but for" the disparaging statement.

> (b) *Amount of Economic Damages Lacks Evidentiary Support.*

As a reminder, the District Court justified over half of the remaining $7.5 million dollar award for the Section 1981 claim on Jones's alleged loss of reputation, using his Hutto salary of $300,000 per year and stating that based on Jones's age "the jury could make the simple logical inference that Jones would work another decade before retiring but for Hutto's violation

---

[136] ROA. 5702-5703.

[137] When Hutto's counsel attempted to object to this double hearsay as narrative, the Court stated, "No, this is different. Now it's not being offered for the truth of the matter asserted. You asked him what was the next disparaging thing that the City of Hutto did. He's answering it, so answer it." ROA.5704. Yet the Court erroneously relied on the testimony for the truth of the matter asserted in justifying Jones's damages. ROA.4960 (citing ROA.5704). This Court should thus disregard the hearsay in its evaluation of the sufficiency of proof on damages.

of his rights, yielding $4 to $4.5 million in lost wages."[138] The size of the award – effectively paying Jones his prior Hutto salary for the rest of his working life – is not supported by the law or the record.

As discussed above, the Court must look to common law tort principles used in Section 1983 cases for guidance on addressing the jury's damages award.[139] *See Carey*, 435 U.S. at 254. The District Court treated Jones's claim as one for lost earning capacity, as if Jones was injured and *unable to work at all*, awarding Jones his full salary until retirement. Lost earning capacity is a form of special damages, and must be specifically alleged and proved. *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 91 (Tex. App.—Corpus Christi 1992, writ dism'd w.o.j.). The plaintiff is required to prove his lost earning capacity "with that degree of certainty to which the case is susceptible…" *McIver v. Gloria*, 140 Tex. 566, 169 S.W.2d 710, 712 (1943).

---

[138] ROA.4959-60. Even if the basis for this statement were valid (which will be refuted), the math is wrong. Jones testified he made $23,500 per month, which equals $282,000 per year. Further, using $300,000 per year for a decade equals $3 million, not $4 million, as the starting point.

[139] Front pay is not at issue in this case, as Jones separated voluntarily as allowed by his employment contract.

No proof showed that Jones was *unable to work at all* – in fact, he worked in consulting, city management, and then transitioned to real estate and construction industry jobs.[140] Jones presented no expert testimony of what the market rate was for city managers at the time, or any evidence of applications for other city management jobs. There is no evidence that he went into the real estate and construction industry because he applied for, but was unable to obtain, a job in city management, or the difference in pay between the two professions. *See Jackson v. Host Intern., Inc.*, 426 F. App'x 222, 223 (5th Cir. 2011) (the court must also consider plaintiff's failure to mitigate damages); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 394 (5th Cir. 2003) (reversing jury award of back pay because jury could only reasonably have found plaintiff mitigated through a date certain, when he stopped applying for more work).

Yet without any evidence of the reason *why* Jones left Missouri City or De Soto, or of other city management jobs he applied for but was rejected, or the market rate of city management jobs in Texas, the jury

---

[140] ROA.5644-5647.

awarded Jones (at least) his *Hutto salary* ($282,000) for the next decade (or indefinite duration depending on what amount was used). There is no plausible damages theory that would support the amount of the jury award. *See Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 367 (5th Cir. 2019) ("Although these types of awards are necessarily imprecise, the jury 'cannot simply pick a number and put it in the blank.') (citation omitted).

Further, any future earnings Jones made (including his $412,000 severance), his $15,000/month consulting fees from De Soto, and his $250,000 annual salary at Missouri City would all be deducted from any loss of future earnings. *See Giles v. Gen. Elec. Co.*, 245 F.3d 474, 489 n. 27 (5th Cir. 2001).

(c) *Non-Pecuniary Damages Lack Evidentiary Support.*

Using the District Court's attempt to justify "4 to 4.5 million dollars" for reputational damages (which are unsupported, as shown above), it follows that the remainder of the $7.5 million dollar award (i.e., $3 to 3.5 million dollars) constituted emotional distress damages. To merit any award greater than nominal damages, emotional distress damages must "be supported by competent evidence concerning the injury." *Giles*, 245

F.3d at 487–88, n. 24 (citing *Brady v. Fort Bend County*, 145 F.3d 691, 718 (5th Cir.1998) (quoting *Carey*, 435 U.S. at 264 n. 20).

There are two requirements to prove emotional distress:

First, there must be "a specific discernable injury to the claimant's emotional state, proven with evidence regarding the nature and extent of the harm." *Giles*, 245 F.3d at 488. "[H]urt feelings, anger and frustration are part of life ... and [are] not the types of harm that could support a mental anguish award." *Id.* (quoting *Brady*, 145 F.3d at 718) (quoting *Carey*, 435 U.S. at 264 n. 20)).

Second, more than vague allegations are required to establish existence of the injury. While corroboration is preferred (from a family member or medical or psychological evidence), plaintiff's own testimony, standing alone, may be sufficient to prove mental damages only if the testimony is "particularized and extensive" enough to meet the specificity requirement discussed above. "Neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages." *Hitt v.*

*Connell*, 301 F.3d 240, 250–51 (5th Cir. 2002) (quoting *Brady*, 145 F.3d at 719); *Giles*, 245 F.3d at 488.

Jones's testimony does not meet these standards. When asked how he felt about not "having the same ability" (a leading question by his counsel) to work in City government, Jones stated, "well, it's horrible for me." [141]He further testified: "I've lost a lot of wages, benefits, career has been tarnished, a lot of stress, a lot of strain, so it's been hard.[142] He stated that "at one point I was ended up having a stress attack is what the doctor called it," and "it's been a stressful process of hearing people call you a crook and you know you didn't do anything wrong."[143] He stated the stress attack occurred in late 2020, and when asked "why that happened" he stated, "it was just a stressful time."[144] Jones provided no testimony from any medical provider.[145]

---

[141] ROA.5652.

[142] ROA.5653.

[143] ROA.5653.

[144] ROA.5654.

[145] When the City objected to the testimony on the ground that Jones had not disclosed any medical providers, Jones's counsel stated he did not intend to offer evidence from any doctors. ROA.5654-5656.

That was the extent of Jones's testimony on emotional distress. No witnesses corroborated his testimony, and there are no medical or psychological records. There is no "specific discernible injury" such as sleeplessness, headaches, depression or marital problems. *See e.g., Giles*, 245 F.3d at 488. Jones's scant, conclusory, and uncorroborated testimony concerning his emotional distress is insufficient to support a jury award of *any* emotional distress damages. *See* e.g., *Hitt*, 301 F.3d at 251 (quoting "all the evidence of mental anguish that Hitt presented" and holding it was insufficient). Nor was there even a suggestion at trial of Jones's *future* emotional distress. *See Miniex*, 400 F. Supp. 3d at 658.

## D. Alternatively, the Excessive Damage Award Should Be Remitted.

The City recognizes that this Court must apply a "highly stringent standard of review . . . to determine whether or not a damage award by a jury is excessive." *Davis v. Mobil Oil Exploration & Producing Southeast, Inc.*, 864 F.2d 1171, 1176 (5th Cir. 1989); *see also Gasperini v. Ctr. for Humans, Inc.*, 518 U.S. 415, 435 (1996); *Caldarera*, 705 F.2d at 784. The Court is limited to "determining whether the trier of fact abused its discretion," and "damage awards will only be overturned in exceptional

cases where such awards are so gross as to be contrary to right reason."

*Davis*, 864 F.2d at 1176 (internal quotations omitted). Yet as demonstrated above, this is one of those rare cases where the amount awarded is so grossly out of touch with the supporting evidence – if any – that this Court should set it aside entirely, or, if more than nominal damages are awarded, a remittitur of most if not all of the $7.5 million should be suggested of the Section 1983 damages (along with the reversal of the contract award). *See Caldarera*, 705 F.2d at 784 (when the jury's award exceeds the bounds of any reasonable recovery, remittitur is proper remedy).

To determine whether the evidence is sufficient to support the magnitude of the amount awarded, the Fifth Circuit applies the maximum recovery rule; and the Court can adjust the excess award through a remittitur. *See Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 299-301 (5th Cir. 2024); *Caldarera*, 705 F.2d at 784. The rule permits a verdict at 150% of the highest inflation-adjusted recovery in an analogous, published decision. *Id.* Otherwise, a remittitur is appropriate. *Longoria*, 932 F.3d at 365.

Here, the District Court concluded that the maximum recovery rule does not apply because there are no factually similar cases in the relevant jurisdiction, effectively excluding hundreds of racial discrimination cases that evaluate jury awards of mental anguish similar to the damages sought in the present case.[146] However, this was too rigid an application of the rule. Emotional distress damages caused by contract-based discrimination should be treated no differently than emotional distress caused by employment-based discrimination. *See Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, 369 (5th Cir. 2002) (applying rule to emotional distress awards in statutory discrimination cases). A sky-is-the-limit approach is not the proper standard. *See Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1427 (5th Cir. 1988) (noting while non-economic damages are not easily determined, "the sky is simply not the limit for jury verdicts, even those that have been once reviewed").

The Fifth Circuit's cases applying the maximum recovery rule in discrimination cases focus on the types of damages being evaluated – emotional distress – rather than the statutory basis for the claim. *See*

---

[146] ROA.4963 (citing *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir.2002).

*Salinas v. O'Neill*, 286 F.3d 827, 831 (5th Cir. 2002); *Harris*, 92 F.4th at 301 (plaintiff's symptoms did not warrant a $300,000 (as capped) compensatory damage award; base sum of $100,000 was more appropriate and remitted the damages using the maximum recovery rule and adjusting for inflation).

Jones's testimony does not rise to the level meriting compensatory damages. *See id.*; *Salinas v. O'Neill*, 286 F.3d 827 (5th Cir. 2002). The awards that have been affirmed above $100,000 were based on detailed, corroborated testimony of the plaintiff's physical manifestations and symptoms of such distress. *See Salinas*, 286 F.3d 827 (holding, in race discrimination case, that evidence of custom services agent's high level of paranoia regarding further retaliation, use of sick leave, numerous visits to physicians, and deteriorating relations with family members supported a damages award of $150,000, not $300,000).

This case is more like *Vadie v. Mississippi State University*, 218 F.3d 365, 375–78 (5th Cir. 2000), in which this Circuit remitted a Title VII award of $300,000 to $10,000, "emphasizing that the sole source of evidence, plaintiff's brief testimony, was insufficient to support the verdict

on emotional injury; plaintiff's entire testimony regarding emotional damages was that 'It destroyed me. It totally ruined me, and I become sick, totally ill, physically, mentally, and everything. I took many doctors, many pills. I did not know what to do, where to go, what to say. I did not know whether it was nighttime or daytime. I could not sleep for months at a time. Headache, nausea. Still I am under severe doctor surveillance because of what they have done to me.'" *Id.* Jones's testimony does not even rise to the level of testimony in *Vadie. See also Brady,* 145 F.3d at 719 (references to "spending too much time on the couch," "accepting it mentally," being "highly upset." and experiencing "the worst thing that has ever happened to me," "hardly qualify as evidence of demonstrable emotional distress, as required by *Carey*").

**E.    Alternatively, the Award Shocks the Conscience and Warrants a New Trial**.

When an award is "so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive, remittitur is inadequate and the only proper remedy is a new trial." *See Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597 (5th Cir. 1988); *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 684 (5th Cir. 1986); *see also Burch v. Coca-Cola Co.*, 119 F.3d

305, 320, n.15 (5th Cir. 1997); *Hell Graphic Sys., Inc. v. Kingcraft Color Graphics, Inc.*, 998 F.2d 1013 (5th Cir. 1993) (citing *Wells* and stating that "[t]he excessiveness of a damage finding itself can be indicative of passion and prejudice").

The verdict in this case is of such exaggerated magnitude that the Court can assume the jury was motivated by passion and prejudice. Aside from the mere size of the award, the jury's conduct during its deliberations is also evidence that the jury was motivated by passion and prejudice, as indicated by four notes to the court during deliberations. Note # 4 asked the court:

> Can we provide stipulations in addition to financial damages? For example, stipulate that plaque removed from Hutto city hall be replaced.[147]

The court responded: "No, you are limited to answering the questions asked."[148] Clearly the jury was impassioned; it wanted to deviate from the court's orders.

---

[147] ROA.6149-50.

[148] ROA.6150.

The jury inadvertently heard evidence of a prejudicial exhibit (an EEOC Charge of Paul Harris against the City alleging race discrimination) due to plaintiff's counsel's "accidentally" changing the number on exhibits. The Court struck the clearly prejudicial exhibit and instructed the jury not to consider it, stating at the bench that it "never would have admitted that," and that it "smacks of a dirty trick" and "the skunk's in the box."[149] Finally, the court struck Jones's reference to George Floyd.[150]

Accordingly, if the judgment is not reversed and rendered or remitted to an award substantially less than $500,000, the City requests a new trial on all issues.

## VI. CONCLUSION & PRAYER.

Appellant City of Hutto requests the Court of Appeals to reverse and render a take nothing judgment for the City, or, alternatively, reverse all but the declaration as to the validity of the Separation Agreement, or alternatively award nominal damages, or alternatively suggest a remittitur of manifestly excessive damages or grant a new trial on

---

[149] ROA.6055-56.

[150] ROA.5660.

Appellee's Section 1981 claim only. The City requests any other relief to which it may be entitled, including costs on appeal.

Respectfully submitted,

By: /s/ *Ramón G. Viada III*

RAMÓN G. VIADA III
State Bar No. 20559350
rayviada@viadastrayer.com
VIADA & STRAYER
17 Swallow Tail Court
The Woodlands, Texas 77381
(281) 419-6338

GEORGE E. HYDE
State Bar No. 45006157
ghyde@txlocalgovlaw.com
HYDE KELLEY LLP
2806 Flintrock Trace, Suite A104
Austin, Texas 78738
(512) 686-0700

ATTORNEYS FOR APPELLANT
CITY OF HUTTO, TEXAS

## CERTIFICATE OF SERVICE

I certify that all counsel of record have been served a true and correct copy of this Brief by electronic submission for filing and service through the Electronic Case Filing System of the Fifth Circuit Court of Appeals on May 10, 2024.

/s/ *Ramón G. Viada III*
Ramón G. Viada III

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT

1.      This document complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) this documents contains 12,983 words.

2.      This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Corel WordPerfect 2021 in 14 point font and Century Schoolbook type style.

_/s/ **_Ramón G. Viada III_**_
Ramón G. Viada III